**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**JAMAICA TOWING, INC., Respondent.**

**No. 1251, Docket 80–4033.**

United States Court of Appeals, Second Circuit.

Argued June 12, 1980.

Decided Oct. 1, 1980.

Paul J. Spielberg, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Andrew F. Tranovich, Atty., N. L. R. B., Washington, D. C., of counsel), for petitioner.

Carl A. Schwarz, Jr., New York City (Raymond L. Vandenberg, Finley, Kumble, Wagner, Heine & Underberg, New York City, of counsel), for respondent.

Before LUMBARD and MANSFIELD, Circuit Judges.*

MANSFIELD, Circuit Judge:

For a second time the National Labor Relations Board (the Board) seeks enforcement of an order entered by it on July 18, 1978, after it found that respondent, Jamaica Towing, Inc. (Jamaica), violated §§ 8(a)(1) and 8(a)(5) of the National Labor Relations Act (the Act), 29 U.S.C. §§ 158(a)(1) and (a)(5), immediately prior to a union representation election held on February 24, 1976, in which Local 917 of the International Brotherhood of Teamsters (the Union) was defeated. Jamaica was ordered to cease and desist from engaging in such unfair labor practices and to bargain with the Union. Upon the prior application we affirmed the Board's findings of unfair labor practices but remanded for further consideration of the order to bargain. 602 F.2d 1100. We directed the Board to consider whether, in view of a substantial change in Jamaica's work force, the bargaining order had become obsolete and unnecessary, and to outline the standards applied by it in its decision to issue a bargaining order rather than to limit itself to a cease–and–desist order followed by a Board–supervised rerun election. Upon remand the Board refused to consider employee–turnover as a relevant factor and did not explain the standards governing its decision to issue a bargaining order in this case as distinguished from its orders in other cases where that remedy had not been imposed. Accordingly, we deny enforcement of the bargaining order.

The facts are fully set out in our prior opinion, 602 F.2d at 1101–03, and need not be repeated in detail here. For present purposes it suffices to point out that at the time of the offenses Jamaica, a small company engaged in automobile towing and body repair, employed 8 tow–truck operators. On January 17, 1976, the Union obtained signed cards from 7 of the 8 authorizing it to act as their collective bargaining representative. A consent election held on February 24, 1976 was lost by the Union by a 6 to 2 vote. Between January 17 and February 24 Jamaica's President, Anthony Giorgianni, engaged in several unfair labor practices in late January, at a meeting of the drivers, he asked them who had signed with the Union and upon receiving no answer walked away. On different occasions he told each of three employees separately that he opposed the Union and could "use muscle" to take care of it. At a meeting with two drivers, after assuring them that no one would be fired because of joining the Union, he pointed out the disadvantages to them of unionization and, upon learning of the benefits which the employees sought to gain through the Union, stated that he could not make any promises because of the pending election but that he would consider the employees' demands. In mid–February, when four drivers, after obtaining a meeting with him, stated they had erred in seeking union representation and would reject the Union if he met certain demands, he repeated that he could not make any promises and outlined his attitude with respect to sick leave, hospitalization, uniforms and wage increases. Shortly thereafter the employees voted 6 to 2 against the Union.

The Union thereupon filed with the Board timely objections to Jamaica's conduct affecting the election, which were upheld by the Regional Director on May 11, 1976. The Board's General Counsel then filed the unfair labor practice charges against Jamaica which resulted in the order presented to us for review. In September, 1976, while the charges were pending but before the Administrative Law Judge (ALJ) had rendered his decision, 3 of the 8 employees were lawfully discharged for reasons later found to be wholly unconnect-

---

* Honorable William O. Mehrtens, Senior District Judge for the Southern District of Florida, sitting by designation, participated in the hearing of this appeal. Judge Mehrtens voted in favor of the disposition herein made, but due to his subsequent illness and death did not have an opportunity to review this opinion. Accordingly the appeal is being disposed of by the other two judges as provided in Second Circuit Rule § 0.14.

ed with their union activities.[1] As a result only 5 employees remained of the original 8.

On December 8, 1977, the ALJ found that Giorgianni had violated § 8(a)(1) of the Act by attempting to find out which employees had signed for the Union and by his individual meetings with each of three employees in which he expressed opposition to the Union and stated he would "use muscle" against it. The balance of Giorgianni's conduct was not found sufficiently egregious to constitute threats or promises of discharge, leading the ALJ to conclude that "the unlawful interrogations and threats ... neither require nor justify the imposition of a bargaining order under the standards set forth by the Supreme Court in *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Two instances of interrogation, and three non-specific threats to resort to 'muscle,' do not, in any judgment, eliminate the possibility of a fair rerun election...." Accordingly he recommended that Jamaica be ordered (1) to cease and desist from engaging in the activities found to be unfair labor practices, or from interfering with the employees' exercise of their rights under § 7 of the Act, and (2) to post a notice in conspicuous places to the effect that it would not engage in such activities and that employees were free to become and remain members of the Union.

Upon exceptions filed by the General Counsel the Board, on July 19, 1978 (more than 2 years and 5 months after the conduct complained of), agreed with the ALJ's findings of unfair practices but rejected his inference as to the relative insignificance of Giorgianni's meeting with employees at which he pointed out the disadvantages of unionization and stated that, although he could make no promises, he would consider the demands and benefits voiced by them. The Board held that this conduct amounted to direct dealing with the employees and repudiation of Jamaica's bargaining obligation, in violation of §§ 8(a)(1) and 8(a)(5) of the Act. It also concluded that Jamaica had "engaged in pernicious conduct which, by its nature, has long–lasting if not permanent effects on the employees' freedom of choice in selecting or rejecting a bargaining representative" and that a bargaining order was required and justified.

On July 29, 1979, following the Board's initial petition for enforcement, we remanded with directions to consider the effect of the turnover of Jamaica's work force and to explain, in terms of standards or guidelines of general application consistent with its denial of bargaining orders in other similar cases, why such an order was required in this case rather than the preferred remedy of a Board–supervised second election held after entry of a cease–and–desist order of the type recommended by the ALJ. That order would require Jamaica to post notices that employees were free to remain or become members of Local 917. See 602 F.2d 1100. Upon remand the Board, in a short "Supplemental Decision and Order," filed on January 17, 1980, for the most part regurgitated its prior decision, adding only that the impact of the employer's misconduct was pronounced and long–lasting because of the nature of the misconduct and the small size of the work force. No effort was made to ascertain the nature and extent of employee–turnover during the period prior to or after its original decision. The Board simply concluded, without any evidentiary basis, that the prejudicial impact of the misconduct had not been dissipated, and that to hold otherwise would reward the employer, putting a premium on

---

1. In September, approximately seven months after the election, three employees who had signed authorization cards (Franqui, Passantino and Shaw) and had testified in this case as witnesses for the General Counsel, were discharged after Jamaica's insurer, despite a request for reconsideration, advised that it would cancel its policy protecting Jamaica against liability unless these employees ceased driving its vehicles, since each had been involved in acci-

dents causing injuries and property damage and one had been convicted of numerous traffic violations. The two more senior of the three employees (Shaw and Passantino) refused offers by Giorgianni to be employed as yardmen. The ALJ found that "the discharges were not related to the union activities or prior testimony of Franqui, Passantino and Shaw, and accordingly, were not in violation of the Act."

its continued litigation. It reaffirmed its July 18, 1978, order, enforcement of which is sought in this petition.

## DISCUSSION

Where an employer's misconduct taints a prior union election by adversely affecting the employees' freedom of choice, the traditional remedy, frequently characterized as the "preferred" or "superior" remedy, see *NLRB v. Jamaica Towing, Inc.,* 602 F.2d 1100, 1104 (2d Cir. 1979); *Donn Products, Inc. v. NLRB,* 613 F.2d 162, 165 (6th Cir. 1980); *Peerless of America, Inc. v. NLRB,* 484 F.2d 1108, 1122 (7th Cir. 1973), has been to (1) vacate the election, (2) enjoin the employer from engaging in such misbehavior, (3) require him to post "contrition" notices to his employees, disavowing any future interference, and (4) direct him to give union representatives reasonable access to the employees. This is then followed by a new Board–supervised election. The issuance by the Board of a bargaining order in lieu of a cease–and–desist order is only proper if, after an objective review of all of the relevant surrounding circumstances, including the nature of the employer's misbehavior and any later events bearing on its impact on the employees, it may reasonably be concluded that the employees will be unable to exercise a free choice in a Board–supervised rerun election.

In *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Court held that under some circumstances the Board might find it necessary, because of the lasting adverse impact of the employer's misconduct upon the employees' freedom of choice, to require the employer to bargain directly with the union which had lost the election rather than simply to order a new election. The Court stated that in "exceptional" cases where the employer's

unfair labor practices have been "outrageous" or "pervasive" a bargaining order would be justified because the coercive effects of the misbehavior would not be eliminated by the traditional remedy, 395 U.S. at 613–14, 89 S.Ct. at 1939–1940. At the opposite end of the spectrum, "minor or less extensive unfair practices ... will not sustain a bargaining order," 395 U.S. at 617, 89 S.Ct. at 1940. The Court noted that in between these two extremes there would be a group of "less extraordinary cases marked by less pervasive practices" where the Board would be called upon to "take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future." If the Board [found] "that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue (see n. 32, *supra* )," 395 U.S. at 614–15, 89 S.Ct. at 1940. The Court left to the Board the task of fashioning a set of guidelines, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939, by which the impact of the unfair practices upon employee free choice might objectively be ascertained.

Certain violations have been regularly regarded by the Board and the courts as highly coercive. These are the so–called "hallmark" violations and their presence will support the issuance of a bargaining order unless some significant mitigating circumstance exists. They include such employer misbehavior as the closing of a plant or threats of plant closure or loss of employment,[2] the grant of benefits to employees,[3]

---

**2.** *NLRB v. Marsellus Vault & Sales, Inc.,* 431 F.2d 933 (2d Cir. 1970); *Morse's Foodmart,* 230 N.L.R.B. 1092, 1101 (1977); *Boston Pet Supply, Inc.,* 227 N.L.R.B. 1891, 1900–01 (1977); *Curtin Matheson Scientific,* 228 N.L.R.B. 996 (1977); *Matouk Industries, Inc.,* 230 N.L.R.B. 892 (1977); *Frito-Lay, Inc.,* 232 N.L.R.B. 753, 755 n.11 (1977); *Beasley Energy, Inc., d/b/a Peaker Run Coal Co.,* 228 N.L.R.B. 93 (1977); *Lud-*

*wig Fish and Produce, Inc.,* 220 N.L.R.B. 1086 (1975); *Tri-City Paving Co.,* 205 N.L.R.B. 174 (1973); *The Sinclair Co.,* 164 N.L.R.B. 261, enfd., 397 F.2d 157 (1st Cir. 1968), affd. sub nom. *Gissel, supra.* Cf., *Stoutco Inc.,* 180 N.L.R.B. 178 (1969).

**3.** *NLRB v. WKRG–TV,* 470 F.2d 1302 (5th Cir. 1974); *Texaco, Inc. v. NLRB,* 436 F.2d 520 (7th

or the reassignment, demotion or discharge of union adherents in violation of § 8(a)(3) of the Act.[4] In such cases the seriousness of the conduct, coupled with the fact that often it represents complete action as distinguished from mere statements, interrogations or promises, justifies a finding without extensive explication that it is likely to have a lasting inhibitive effect on a substantial percentage of the work force. The actual use of a "stick" in the form of a plant closure, or the resort to physical force or discharge, pose no problem of assessing credibility or unlikelihood of implementation. They are complete acts which may reasonably be calculated to have a coercive effect on employees and to remain in their memories for a long period. The prospect of unionization is not a sure safeguard against such tactics.

"... the reassignment, demotion, or discharge of union adherents will carry a message which cannot be lost on employees in the voting group. While there is some slight chance that a single 8(a)(3) violation will not be perceived as employer retribution, repeated violation will rarely if ever be misinterpreted. The impact on employees might be erased if our standard make–whole remedy could be swiftly obtained. But unfortunately, in the usual litigated case, restoration to employment comes months or years later, if at all, and thus the coercive effect of the discrimination is unlikely ever to be undone. The Board, therefore, since *Gissel*, has regularly issued a bargaining order where a union majority was dissipated by such tactics. See, e. g., *Drives, Incorporated*, 172 NLRB No. 101 and 179 NLRB 526, enfd. 440 F.2d 354 (C.A.7). *J. H. Rutter–Rex Manufacturing Co., Inc.*, 164 NLRB 5, enfd. in part and remanded in part 415 F.2d 1133 (C.A.6), 180 NLRB

878, enfd. 434 F.2d 1318 (C.A.6)." *General Stencils, Inc.*, 195 NLRB 1109, 1112 (1972, upon remand) (Chairman Miller, dissenting).

Similarly, the employer, by "remedying the very grievances which gave rise to the union interest, ... destroy[s] for the moment at least the employees' need for greater strength ... [so that] the employees can not be said to have been free to fairly appraise the value of unionization." *Texaco, Inc. v. NLRB, supra*, 436 F.2d at 525. See, in accord, *NLRB v. Eagle Material Handling, Inc.*, 558 F.2d 160, 167 (3d Cir. 1977). As for a threat of plant closure, it may not be completed action but it "is the one serious threat of economic disadvantage which is wholly beyond the influence of the union or the control of the employees." *General Stencils, supra*, 195 N.L.R.B. at 1113 (Chairman Miller dissenting). However, even with respect to these "hallmark" violations, a bargaining order may be denied for lack of proof of pervasiveness, such as where the discharge of an employee was unknown to most of the other employees or the discharged employee was not known to be a union adherent. See *Munro Enterprises, Inc.*, 210 N.L.R.B. 403 (1974); *General Stencils, Inc., supra*, 195 N.L.R.B. 1112 (Chairman Miller, dissenting).

■ In contrast to the hallmark unfair labor practices just catalogued, which justify a bargaining order, there is an array of less serious violations which must either be numerous or be coupled with some other factor intensifying their effect before they will fall within *Gissel's* second category and support an order to bargain. These include such employer misconduct as interrogating employees regarding their union sympathies, holding out a "carrot" of promised benefits, expressing anti–union resolve, threatening that unionization will result in

---

Cir. 1970); *NLRB v. Mather Company, Fluorotec Div.*, 432 F.2d 944 (6th Cir. 1970); *Tipton Electric Co.*, 242 N.L.R.B. No. 36 (1979); *Honolulu Sporting Goods Co.*, 239 N.L.R.B. 173 (1979); *Bookland, Inc.*, 221 N.L.R.B. 35 (1975); *Skaggs Drug Centers, Inc.*, 197 N.L.R.B. 1240 (1972); *International Harvester Co.*, 179 N.L.R.B. 753 (1969); *Tower Enterprises, Inc.*, 182 N.L.R.B. 382, 387 (1972).

4. See, e. g., *Freehold AMC Jeep*, 230 N.L.R.B. 903 (1977); *Great Chinese American Sewing Co.*, 227 N.L.R.B. 1670 (1977); *Taylor Bros., Inc.*, 230 N.L.R.B. 861 (1977); *C. & E. Stores, Inc.*, 229 N.L.R.B. 1250 (1977); *Pope Maintenance Corp.*, 228 N.L.R.B. 326 (1977); *Ludwig Fish & Produce Inc.*, 220 N.L.R.B. 1086 (1975).

decreased benefits, or suggesting that physical force might be used to exclude the union. In such cases the Board may not presume an adverse effect, lasting or otherwise, upon the employees' free choice. The Board must undertake the task of investigating the circumstances thoroughly to determine the seriousness, extent, and longevity of any inhibitive impact. The reason for this requirement lies partly in the fact that talk is apt to be taken less seriously by employees than action. Promises of benefits may be viewed as mere ploys, never to be fulfilled without union bargaining pressures. Suggestions that unionization will lead to lesser benefits may be discounted by the employees' belief that effective collective bargaining will prevent them from ever being put into effect. Implementation of threats to increase work shifts or to adhere more strictly to work rules may not be in the employer's own economic self–interest. Moreover, failure to show that such promises or threats were widely disseminated among the work force may weaken any inference of coercive effect.

In our view the Board must also, in considering the advisability of a bargaining order in response to these lesser violations, consider subsequent events bearing upon employee choice, including changes in the management as well as in the work force and the passage of time. *NLRB v. General Stencils, Inc.*, 472 F.2d 170, 175 n.5 (2d Cir. 1972); *Peerless of America, Inc. v. NLRB, supra*, 484 F.2d at 1121; *NLRB v. Ship Shape Maintenance Co., Inc.*, 474 F.2d 434, 443 (D.C.Cir.1972); *NLRB v. Dixisteel Buildings, Inc.*, 445 F.2d 1260, 1265 (10th Cir. 1971); *General Steel Products, Inc. v. NLRB*, 445 F.2d 1350 (4th Cir. 1971); *NLRB v. American Cable Systems, Inc.*, 427 F.2d 446 (5th Cir.), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). Cf., *G. P. D., Inc. v. NLRB*, 430 F.2d 963 (6th Cir. 1970); *NLRB v. L. B. Foster Co.*, 418 F.2d 1 (9th Cir. 1969). Although mere passage of time does not preclude a bargaining order, *NLRB v. Katz*, 369 U.S. 736, 738 n.16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); *NLRB v. Gissel Packing Co., supra*, 395 U.S. at 610–11, 89 S.Ct. at 1938, and we must

guard against rewarding an employer for his own misconduct or delaying tactics, there are cases where later relevant events are not of the employer's making and may, if ignored, result in unnecessarily thwarting the genuine desires of the current work force. If a new election would reliably reflect genuine, uncoerced employee sentiment, it does not reward the employer to hold one. Instead, it "effectuates employee rights," as *Gissel* requires, 395 U.S. at 612, 89 S.Ct. at 1939. An employer is "rewarded" by a new election only when the original authorization cards are a more reliable indicator of employee desires than a new election. In resolving this issue it is illogical not to consider all relevant factors, including employee–turnover and lapse of time. As Judge Friendly pointed out in *NLRB v. General Stencils, Inc., supra*, 472 F.2d at 176 n.5:

> "Where the focus is thus on ascertaining employee choice and examining the conditions likely to surround a future election, changes in personnel and the passage of time are relevant considerations in the Board's analysis. When the question whether the employer's conduct prevented a fair election is marginal in any view, as demonstrated by a dissent from one of its own members, it would seem that the Board should more carefully weigh the deterrent effect of a bargaining order on an employer found to have violated § 8(a)(1) against the possibility of inflicting what may be a totally unwanted, and even largely unknown, union on a new work force. See *NLRB v. Staub Cleaners, Inc.*, 418 F.2d 1086, 1090 (2 Cir. 1969) (Lumbard, Chief Judge, dissenting)."

Employee–turnover and lapse of time may therefore become major factors in close cases such as the present one. Although new employees, who would be disenfranchised by bargaining, may gain some protection from their right to file a decertification petition after the Union bargains for a reasonable time with the employer, see *Gissel, supra*, 395 U.S. at 613, 89 S.Ct. 1939; *Ex–Cell–O Corp. v. NLRB*, 449 F.2d 1058, 1063 (D.C.Cir.1971); *NLRB v. Drives*

*Inc.,* 440 F.2d 354, 367 (7th Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971), such a burden should not be imposed upon them in a close case. The nature of the subsequent events and their importance in the particular case should be the yardstick. For instance, a heavy turnover within weeks after the employer's misconduct or a change in management to one which gives genuine and sincere assurances to the work force of non–interference by the employer would weigh heavily in favor of a new election rather than a bargaining order in a case where the misbehavior of the prior management had been marginal.

It is also significant that a refusal to give weight to subsequent events runs counter to the Board's own consideration of such events in determining, as directed by the Supreme Court in *Gissel,* 395 U.S. at 614, 89 S.Ct. at 1940, whether there is a likelihood that the employer would in the future repeat his unfair labor practices. The Board, for instance, has expressly taken into account an employer's later conduct revealing a "willingness to cooperate in bringing about a fair rerun election" (Brief of NLRB Gen. Counsel, 19). See *Peerless of America, Inc., supra,* 484 F.2d at 1121; *Restaurant Associates Industries,* 194 N.L.R.B. 1066 (1972). In addition, the Board has refused to issue a bargaining order where the impact of the employer's misconduct "has, in part at least, likely been dissipated by [a] very considerable lapse of time," *May Department Stores Co.,* 211 N.L.R.B. 150, 152 (1974).[5]

As we noted on the prior appeal in this case, 602 F.2d at 1104–05, review of the Board's rulings with respect to issuance of a bargaining order in the second *Gissel* category of cases is further complicated by the Board's ambivalence in the matter and the apparent inconsistencies in its case law on the subject. In some marginal cases the Board has granted bargaining orders, see, e. g., *General Stencils, Inc.,* 195 N.L.R.B. 1109 (1972); *Peerless of America, Inc., supra*; *Jamaica Towing Inc.,* 247 N.L.R.B. No. 142 (1980), and in other cases involving the same type or even more egregious misconduct it has denied such orders, see *Schrementi Brothers Inc.,* 179 N.L.R.B. 853 (1969); *Gold Circle Department Stores, Inc.,* 207 N.L.R.B. 1005 (1973); *May Department Stores Co., supra*; *Stoutco, Inc.,* 180 N.L.R.B. 178 (1969), all without rhyme, reason or differentiating factors other than the Board's conclusory statements. This has led us, in the interest of avoiding arbitrariness and insuring that like cases will receive like treatment to direct the Board to articulate more precisely the standards employed and the facts found in those cases which in its opinion justify a bargaining order instead of a cease–and–desist order. *Jamaica Towing, Inc., supra,* 602 F.2d at 1105; *General Stencils, Inc.,* 438 F.2d 894, 904–05 (2d Cir. 1971). Other circuits share our concern. See *Peerless of America, Inc., supra,* 484 F.2d at 1118–19 (7th Cir.); *NLRB v. Armcor, Industries, Inc.,* 535 F.2d 239, 244–45 (3d Cir. 1976); *NLRB v. Kaiser Agricultural Chemicals,* 473 F.2d 374, 383 (5th Cir. 1973).

Applying these principles to the present case, we are satisfied that the bargaining portion of the Board's order is not justified. It is true that the employer's unfair labor practices here, which consisted of interrogation of employees, expressions of opposition to the Union, statements that unionization might result in loss of benefits through less overtime and stricter enforcement of work rules, implied promises that some of the employees' demands would be met, and statements that the employer might "use muscle" to oppose the Union, can hardly be dismissed out of hand or minimized. They were uttered by the chief

---

**5.** The full statement of the Board in *May Department Stores Co.,* reads as follows:

"[W]hatever 'lingering effect' the Respondent's unfair labor practices may have had has, in part at least, likely been dissipated by the very considerable lapse of time here which time lapse also casts some doubt on the card signatures as evidence of majority status. We note, in this connection, that the record is at best unclear as to what portion of the cards are stale, a factor which further militates against finding a bargaining order to be an appropriate remedy in the circumstances of this case." 211 N.L.R.B. at 152.

executive in charge, Mr. Giorgianni, who had the capacity to carry them out, rather than by a lower–level supervisor, who might lack such authority. They were also uttered to members of a small work force of only 8 drivers where the likelihood of dissemination was greater than among a larger number of employees. All of these factors militate in favor of the Board's order.

On the other hand, the misbehavior definitely falls within the category of non–hallmark violations. The employer's conduct was limited entirely to Giorgianni's oral statements, none of which was ever put into effect. There was no plant closure or threat of closure, no actual grant of benefits, no discharge of employees or even threats of discharge in reprisal for union adherence (on the contrary, Mr. Giorgianni assured the employees that their jobs were secure), and no use of force. There was no evidence that any of the drivers, who were undoubtedly used to blunt talk, feared the loss of their jobs. On the contrary, four members attempted to bargain directly with Mr. Giorgianni by stating that they might dispense with unionization if he would meet certain demands. Recognizing that he was on a tightrope Giorgianni gave an ambivalent response. Although the size of the work force is a relevant factor, the Board has not hesitated to find bargaining orders unwarranted in cases involving small employee groups. See *Restaurant Associates Industries,* 194 N.L.R.B. 1066 (1972); *New Alaska Development Corp.,* 194 N.L.R.B. 830 (1972); *Blade–Tribune Publishing Co.,* 180 N.L.R.B. 432 (1969). Counterbalancing the smallness in size of the unit is the greater likelihood that any substantial employee turnover may radically change the desires of the majority of the current work force with respect to unionization.

The Board has not directed us to any case where it has issued a bargaining order under similar circumstances. The cases relied upon by it all involve more egregious misconduct. As we indicated in our first opinion, we are especially concerned over the effect of employee–turnover, which was wholly unrelated to the employer's unfair labor practices. The three union adherents who left the company's employ represented 37½% of the unit. Assuming that the driver who did not originally sign a union authorization card remained in Jamaica's employ, only 50% of the original group who signed cards would remain. There is no evidence as to whether new drivers were hired to replace the three who had departed or, if so, whether they favored the Union. We are left to speculate regarding subsequent events bearing directly on the issue of the appropriate remedy. Since the departure of the three drivers occurred in September, 1976, which was only seven months after the election and more than nine months prior to the Board's issuance of a bargaining order (the ALJ having recommended against such an order in December, 1977), we do not believe that these events should be disregarded on the ground that to give them weight would somehow "reward" the employer for its misconduct or, in the Board's words, "put a premium upon continued litigation by the employer." In view of the immediacy with which the turnover occurred and its lack of any connection with the employer's behavior, the proper course for the Board on remand was to elicit evidence regarding the changed composition of the work force and determine whether the bargaining order might impair the rights of so large a percentage of the employee unit that it would now do more harm than good. This the Board has failed to do.

At this late date, almost five years after the events at issue, no useful purpose would be served by a second remand. In our view the Board, despite a full opportunity to remedy basic deficiencies in the record, has failed to do so.

Accordingly the order is enforced except for the bargaining requirement which is denied.