NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHESTER VALLEY, INC., Respondent.

Nos. 975, 1375, Dockets 80–4234, 4236.

United States Court of Appeals,
Second Circuit.

Argued April 8, 1981.

Decided June 22, 1981.

Thomas W. Budd, New York City (Clifton, Budd, Burke & DeMaria, Richard K.

Muser, New York City, of counsel), for respondent.

James Y. Callear, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, W. Christian Schumann, Atty., N.L.R.B., Washington, D.C., of counsel), for petitioner.

Before FEINBERG, Chief Judge, and LUMBARD and VAN GRAAFEILAND, Circuit Judges.

LUMBARD, Circuit Judge:

Before us are two applications for enforcement of orders of the National Labor Relations Board. The order in 80–4236 is based upon alleged unfair labor practices committed in the course of a representational election campaign at Chester Valley, Inc., and in No. 80–4234, upon an unfair labor practice allegedly committed by Chester Valley while proceedings on the initial matter were pending before the Board. We consider each application in turn.

*No. 80–4236:*

In a Board-ordered election, Chester Valley's employees rejected representation by Local 445 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("the Union"). Following the vote, the Union charged that Chester Valley had committed a number of unfair labor practices during the election campaign. The Administrative Law Judge, after conducting hearings, sustained most of the unfair labor practice charges and ordered Chester Valley to bargain with the Union. The Board adopted the ALJ's findings and recommended order, and it now applies for enforcement. Because we find that there was insufficient proof of one of the unfair labor practice charges and because we believe that reversal on that charge precludes enforcement of a bargain-

ing order, we grant enforcement in part and deny enforcement in part.

I.

Chester Valley is a New York corporation engaged in the sale of fuel oil, gasoline, automotive supplies and automotive and oil burner services. Its main facility is in Chester, New York, with other facilities at Vails Gate and Monroe, New York. In the fall of 1978, Mike Monte began discussing with fellow employees the possibility of union representation at Chester Valley. Monte also spoke with the Union. After obtaining signed authorization cards from a majority of employees, the Union filed, on November 1, 1978, a petition for a Board-supervised representation election in a unit consisting of employees at the Vails Gate and Monroe facilities. On November 2, the Union requested recognition and bargaining in a unit of employees at the Chester and Vails Gate facilities.[1] The Company refused to bargain. The election, which resulted in an 18–14 vote against the Union, was held on January 16, 1979.

We summarize the ALJ's findings of fact relating to the unfair labor practices during the election campaign. Gary Jones, who was the Company's bookkeeper and held the title of "Controller," in November of 1978 asked a group of employees at Chester what it would take for them to forget about the Union.[2] Jones was told that things had gone too far for "a simple raise or something like that." Shortly before the election, Jones made a similar request of employee Monte alone. Monte replied that he wanted everything the Union had gotten in other contracts plus a guaranteed job. Before the election, Jones called employee Zaccagnino into his office, disparaged the Union's pension plan and stated that he could work out a more advantageous "deal" where Zaccagnino could put in the same forty cents per hour as would go into the Union pension plan into a Company profit-

---

1. Although on November 13, 1978 the Union amended its election petition to include employees at all three facilities, the Union never requested bargaining in the unit.

2. Jones had previously made a similar request of employee Vogt, but this was found by the ALJ to have occurred prior to the filing of the representation petition.

sharing plan. Monte subsequently overheard Jones tell Zaccagnino to think seriously about Jones's proposal and that Zaccagnino would wind up "way ahead."

Also during the campaign, the manager of the Monroe facility, Francis Walters, discussed on many occasions the pros and cons of unionization with the Monroe employees and with employees Monte and Kennybrook, both of whom made frequent deliveries to the Monroe facility. During one such discussion, Walters stated to a group of employees that if the Union won the election, the resulting expenses would force him to cut costs and one method would be to turn the Monroe gasoline facility into a self-service station. In another discussion, Walters stated that if the Union won, company President Krieger would not continue to retain part-time employees. (Many of the Monroe employees worked part-time). Walters also told Monte that unionization would not be good for the Monroe employees, that if he had to, he would turn the facility into a self-service one, that the Company had been very accommodating in granting flexible work hours to the Monroe part-timers, many of whom were high school students, and that the Union might require physical examinations which would pose a problem for full-time Monroe employee Strobl who had eye trouble. Walters made similar statements about the possibility of going to a self-service operation on other occasions.

On December 22, 1978, Company President Krieger wrote a letter to all employees stating that if the Union "gets in," wages and benefits would be subject to negotiation and could "go up or down." Krieger reminded employees of the Company's flexibility in scheduling work hours, and of other benefits such as discounts on gasoline and repair work, uniforms, and liberal breaktimes. He stated that all the benefits would become negotiable if the Union "gets in."

Approximately one week before the election, Krieger made a speech to all of the employees. He stated that he was hurt that the employees had gone to the Union

and that he had always had an "open door" policy. He said that whatever the employees could get from the Union, they could get from him. Krieger also stated that the Union might require employees to take physical examinations and he knew that some employees might have difficulty passing.

Finally, the ALJ found that the Company had granted a wage increase in December of 1978, retroactive to November 25. The Company had previously granted wage increases in November of 1976 and 1977. In a letter to employees announcing the raises, Krieger stated that in past years he had given wage increases in the fall, but this year he had been uncertain, because of the election petition, whether he could grant raises. He stated that, despite advice of counsel that there was some legal risk in granting such increases, he would do so anyway. For the majority of employees, the raise was a flat 7% increase, although others were granted the legally mandated increase in the minimum wage, and one employee—on a commission salary—received no raise.

Based upon these findings, the ALJ held that the Company had violated section 8(a)(1) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) (1976). First, the ALJ held that Controller Jones's statements to employees, constituted promises of benefits to induce abandonment of the Union. The ALJ rejected the Company's argument that it was not answerable for Jones's statements. Jones was the Company "Controller," he supervised office personnel, and was believed by employees to have the authority to advise them as to the Company's wage policies.

Second, the ALJ held that the Company also violated section 8(a)(1) by the veiled threats made by both Walters and Krieger. These threats included 1) references by both Walters and Krieger to physical examination requirements, 2) statements by Walters that if the Union came in, there might be changes in the practice of accommodating part-time employees' work hours, 3) Krieger's statements in his December 22 letter

mentioning that benefits such as flexible work hours might be bargained away and that the Union might "force" him to discontinue other benefits such as gasoline discounts and liberal breaktimes, and 4) Walters's statements that if unionization occurred, the Monroe facility might become self-service, and that the Company might not be able to afford part-time employees. The ALJ rejected the Company's argument that in making many of these statements Krieger or Walters attributed the possible changes in working conditions to conduct by the Union. The ALJ noted that the Company had the power unilaterally to effect these changes, and that the speakers did not base their predictions on objective facts demonstrating that the changes in conditions would be beyond the Company's control. Thus the ALJ held that the statements could reasonably be said to have had a tendency to interfere with the free exercise of employee rights.[3]

Third, the ALJ found a violation of section 8(a)(1) based upon Krieger's statements in his speech that the Company had an "open door" policy, that if employees came to them in the future he would deal with their problems, and that they could get from him whatever the Union could obtain. The ALJ held that these statements constituted a solicitation of grievances and a promise to remedy them in order to discourage Union representation. The ALJ rejected, as lacking support, the Company's defense that Krieger was merely clarifying a previously established management policy of welcoming and remedying employee grievances.

As to the wage increase, the ALJ held that there was nothing illegal in either the timing or retroactivity of the benefits. The raises were in accord with the Company's practice of granting annual wage increases in November and the lateness of the increase and accompanying retroactivity were explained by the Company's good faith doubts concerning the legality of the in-

creases. Action was taken within a reasonable time after receiving competent advice from counsel.

At the close of the hearing, however, the General Counsel had moved to amend the complaint against the Company to include the charge that the wage increases in 1978 were disproportionately large. In its closing statement, having decided to submit no further evidence on the issue, Company counsel argued that the General Counsel had failed to offer sufficient evidence that the wage increase was disproportionately large.

In her opinion, the ALJ granted the General Counsel's motion to amend, and concluded that indeed the wage increase was significantly larger than in prior years. Evidence as to three employees led the ALJ to find that the 1978 7% increase was from 42% to 112% higher than the 1977 increases and from 60% to 100% higher than the 1976 increases. The ALJ stated that, although there was no other evidence of the size of 1976 or 1977 increases, the burden was on the Company to prove that the 1978 increases were "based on the size of the increases in previous years." Noting that the Company had failed to introduce records as to the other 1976 and 1977 increases, the ALJ drew the inference that November 1978 raises were significantly higher than earlier raises. She rejected the Company's arguments that the General Counsel bore the burden on this point and had obtained Company records by a subpoena, that the Consumer Price Index had increased at a substantially greater rate in 1978 than 1976 or 1977, and that one of the three employees for whom there was evidence had also been granted a raise in May of 1976 of approximately 6.10% and thus had raises of approximately 13.4% over 1976 and 1977.

No violation of section 8(a)(5), 29 U.S.C. § 158(a)(5) (1976) was found because the Union had never requested bargaining in the proper unit of employees in all three facilities.

---

**3.** The ALJ found that on one occasion Walters had directly tied the advent of a self-service operation to increased expenses brought on by

unionization, and therefore there was no violation of section 8(a)(1) at that time.

Based upon the unfair labor practices she had found, the ALJ held that a bargaining order was the appropriate remedy.[4] The ALJ found that the unfair labor practices were "extensive" in that all employees heard Krieger's speech and received his letter and many employees heard the offending statements by Jones and Walters. She noted that the higher wage increases would have a "lingering effect" on those who remained at the Company because the raises would be included in all total paychecks. She thought it likely that these employees would pass along the story of the pre-election increases to any new employees. Therefore, the ALJ reasoned that use of cease-and-desist orders and posting of notices would not be likely to erase the effects of the Company's unfair labor practices and, on balance, a bargaining order would better express the employees' preferences. The Company's obligation to bargain was set retroactively at November 1, 1978, the approximate date on which the unfair labor practices began.

A three-member panel of the Board affirmed the ALJ's rulings, findings and conclusions, and adopted the recommended bargaining order. One member dissented on the issue of wage increases. He took the position that the General Counsel had failed to present sufficient evidence of a disparity between the size of the 1978 increase and those of prior years.

## II.

■ The Company's arguments to set aside the unfair labor practices other than those concerning the wage increase do not require detailed treatment. Regarding the violations based upon statements made by Controller Jones, the Company argues that Jones was not a supervisor nor was he acting as an agent of the Company. As the ALJ found, however, Jones was treated as a member of the management, participated in discussions with Company counsel regarding the organizing campaign, kept the Com-

pany records, supervised the office staff and was consulted by employees on payroll matters. Thus there was ample reason to conclude that employees would believe that Jones was speaking as a representative of the employer. The Company's other objections to the unfair labor practice finding based upon Jones's statements challenge the sufficiency of the evidence and the credibility findings of the ALJ, particularly the ALJ's crediting of Zaccagnino's version of his meeting with Jones and her discrediting of Jones's version. We are not persuaded and note in particular our reluctance to interfere with the credibility judgments of an ALJ. *See, e. g., NLRB v. Columbia University,* 541 F.2d 922, 928 (2d Cir. 1976), quoting *NLRB v. Dinion Coil Co.,* 201 F.2d 484, 490 (2d Cir. 1952).

■ As for the implicit threats found by the ALJ in statements made by Walters, the Company argues that only once did Walters mention the possibility of conversion to self-service and on that occasion he clearly attributed the possibility to cost increases imposed if the Union won and achieved the benefits it was promising. It also argues that, in any event, Walters was always understood in discussing unionization to be referring to cost increases imposed by the Union's promised benefits. In analyzing Walters's statements regarding conversion to self-service, flexibility of work hours and retention of part-time workers, the ALJ correctly applied the standards set out in *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). As stated in *Gissel,* an employer is free to tell only "what he reasonably believes will be likely economic consequences of unionization that are outside of his control." *Id.* at 619, 89 S.Ct. at 1942 quoting *NLRB v. River Togs, Inc.,* 382 F.2d 198, 202 (2d Cir. 1967). He must base such predictions on "objective fact." *Id.* at 619, 89 S.Ct. at 1942. He may not imply that action unfavorable to the employees will be

---

**4.** The ALJ found that all of the Union authorization cards would be counted as valid despite objections by the Company that Union officials and Company employees misrepresen-

ted to signers the significance of the cards. With all the cards counted, the Union was favored by a majority of employees at the time the Company began its unfair labor practices.

taken "solely on his own initiative for reasons unrelated to economic necessities and known only to him." *Id.* at 619, 89 S.Ct. at 1942.

The record supports the ALJ's conclusions that Walters's statements fell outside the permissible bounds established in *Gissel.* There was testimony as to more than one reference to self-service conversion and there was also testimony as to Walters's failure in most instances to attribute possible unfavorable changes to any costs which would result from union representation. Under the circumstances, the ALJ was justified in finding that the statements constituted veiled threats of reprisal for pro-Union votes. *See, e. g., El Rancho Mkt.*, 235 NLRB 468 (1978), enf'd, 104 LRRM 2612 (9th Cir. 1979); *NLRB v. Rollins Telecasting, Inc.*, 494 F.2d 80, 84–85 (2d Cir.), cert. denied, 419 U.S. 964, 95 S.Ct. 224, 42 L.Ed.2d 178 (1974); *Marathon LeTourneau Co.*, 208 NLRB 213 (1974).

■ Similarly, there was sufficient evidence to support the ALJ's conclusion that Krieger and Walters violated section 8(a)(1) in stating that physical examinations might result from unionization. There was proof that physical exams were only required in Union contracts at the request of the employer. The ALJ could reasonably conclude then that such references were veiled threats that examinations might be required by the employer if the Union won the election. Krieger's other statements, both in his speech and his December 22 letter, regarding flexible work hours and other company benefits also support a finding that he implicitly threatened employees with imposing harsher conditions should the Union achieve recognition. As the ALJ noted, Krieger's statement that the Union might "force" him to discontinue these "favors" did not fairly rest on any possibility that the Union would bargain away these benefits. In general, there was sufficient evidence for the ALJ to conclude that Walters's and Krieger's statements were not accompanied by any causal links to specific Union demands and therefore constituted coercive threats rather than honest fore-

casts. *See, e. g., NLRB v. Mangurian's, Inc.*, 566 F.2d 463, 466 (5th Cir. 1978).

■ We also believe there was sufficient evidence to uphold the ALJ's finding that statements made in Krieger's speech constituted a solicitation of grievances and a promise to remedy those grievances. The Company's only defense on this point was that Krieger was merely stating and reconfirming a long-standing "open door" policy, but there was sufficient evidence for the ALJ to conclude that no such prior practice existed. Such a change in policy toward grievances and corrective action justifies a finding of a section 8(a)(1) violation. *See, e. g., Jefferson National Bank*, 240 NLRB 1057 (1979); *Carbonneau Industries*, 228 NLRB 597 (1977); *Reliance Electric Co.*, 191 NLRB 44 (1971).

■ On the issue of wage increases, the Company first attacks the propriety of the ALJ's granting of the General Counsel's request to amend the complaint to include the charge that the raises were disproportionately large. We think it was proper for the ALJ to allow the amendment, since the Company was given a full and fair opportunity to rebut the charge. Company counsel was asked whether, if amendment was granted, the Company wished to submit any additional evidence, and counsel replied in the negative. Moreover, from a reading of counsel's concluding argument it is clear that the Company took the position that no further proof on this issue was necessary since the General Counsel had failed to establish a *prima facie* case.

■ On the merits, however, we agree with the Company's position, and with the dissenting member of the Board, that the General Counsel failed to sustain his charge that the 1978 wage increases were unusually large. When wage increases are granted during the course of an election campaign, the burden is on the employer to overcome the presumption that benefits were intended to influence the employees to vote against the Union. *NLRB v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); *Faith Garment Co. v.*

*NLRB,* 630 F.2d 630, 632 (8th Cir. 1980); *NLRB v. Eastern Smelting & Refining Corp.,* 598 F.2d 666, 675 (1st Cir. 1979). Here, the Company sustained its burden by demonstrating that the 1978 wage increase was in accord with its established policy of announcing raises in the fall, that the increases were withheld slightly beyond the usual time only because of a good faith concern as to the legality of the increases, and that, once competent advice was given by counsel, the Company acted quickly to give increases retroactive to the time the annual increases would usually have been given.

■ The issue of the size of the wage increases is distinct. NLRB decisions make clear that where the size of increases is in question, the burden is on the General Counsel to demonstrate that the increases were abnormally large and were timed to influence employees' organizational decisions. Once this is shown, the General Counsel has put forth a *prima facie* case of interference with employee rights, and the burden shifts to the employer to establish that the increases were consistent in size with those granted in prior years or that the increases were timed so as not to interfere with employee rights. *See, e. g., Colonial Haven Nursing Home, Inc.,* 218 NLRB 1007 (1975); *The Savings Bank Co.,* 207 NLRB 269 (1973); *Summitville Tiles, Inc.,* 190 NLRB 640, 640 n.1 (1971); *see also Alco Venetian Blind Co., Inc.,* 253 NLRB No. 161 at n.2 (1980); *San Lorenzo Lumber Co.,* 238 NLRB 1421 (1978). Here, the only evidence introduced by the General Counsel was the testimony of employee Vogt that in the two prior Novembers he received 2% increases, but in 1978, he received a 7% increase. As the ALJ found, however, Vogt received increases of approximately 3.5%. Moreover in May of 1976 he had received an increase of over 6%. Thus, the ALJ found that in the two years prior to 1978 Vogt had received increases totalling 13.4%.

■ The only other evidence in the record supporting the charge was that offered by two of the Company's witnesses. Employee Schaffer received 1976 and 1977 increases of approximately 4% and 5% respectively; employee Williams received increases in each of the prior years of slightly over 4%. They both received 1978 increases of 7%. This evidence, as to only three employees, is clearly insufficient. We also take note that the Consumer Price Index rose at a substantially greater rate in 1978 than in the two preceding years.

■ The ALJ also erred in buttressing the meager evidence supporting the General Counsel's charge by drawing an "adverse inference" from the Company's failure to produce payroll records. As one court has remarked, the rule that an unfavorable inference shall be drawn against a party which fails to introduce evidence known to be in its control will not apply where a party has good reason to believe that its opponent has failed to meet its burden of proof. In such a situation, there is a good faith belief that there is no need to offer further evidence, and therefore no inference can properly be drawn from nonproduction. *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) v. NLRB,* 459 F.2d 1329, 1338 (D.C.Cir.1972), citing *NLRB v. A.P.W. Products Co.,* 316 F.2d 899, 903 (2d Cir. 1963). We also note that the Company's records had been subpoenaed by the General Counsel who, as we have pointed out, bore the burden on this issue.

Finally, the Board's decision on this issue is inconsistent with its recent decision in *Alco Venetian Blind Co., supra.* In that case, the Board agreed with the ALJ that the General Counsel had failed to establish that wage increases varied unlawfully from those granted in previous years, and the proof supporting the General Counsel was stronger than that in this case. There, although the wages granted to each employee each year varied in size, the company's records revealed that the raises in the year in question increased from the year before on average from approximately 6.5% to 12.5%. With a few exceptions, the increases for the preceding year were in the range of 5% to 5.7%, while for the year in question, they

generally ranged from 11% to 12.9%. The ALJ, however, took note of the increasing rate of inflation and found it responsible for the larger raises. The ALJ stated that in terms of real wages employees had received very small increases.

■■■ For these reasons, the holding that the Company violated section 8(a)(1) by granting unusually large increases cannot stand. It follows that the appropriateness of the bargaining order remedy is called into question. While we might remand for reconsideration of the remedy in light of our unfair labor practice holding, we believe that the remaining unfair labor practice findings are insufficient as a matter of law to support a bargaining order remedy. *See, e. g., Peerless of America, Inc. v. N.L.R.B.*, 484 F.2d 1108 (7th Cir. 1973). In *NLRB v. Jamaica Towing, Inc.*, 632 F.2d 208 (2d Cir. 1980), this Circuit most recently ruled on the appropriateness of ordering recognition and bargaining as a remedy for unfair labor practices committed by an employer during the course of an election campaign. As we noted in that opinion, *id.* at 212, the traditional and preferred remedy in such cases is to vacate the original election, enjoin future unfair practices, require posting of notices disavowing interference, direct that union representatives be given reasonable access to the employees, and finally order a new Board-supervised election. The issuance of a bargaining order is warranted only where these remedies are found inadequate and where "it may reasonably be concluded that the employees will be unable to exercise a free choice in a Board-supervised rerun election." *Id.*[5]

■■■ The Supreme Court in *NLRB v. Gissel Packing Co., supra*, held that bargaining orders would be an appropriate remedy either in the "exceptional" cases where unfair labor practices were "pervasive" or "outrageous" or in those "less extraordinary cases marked by less pervasive practices" where the Board found that the severe impact of the unfair practices on employee free choice and the likelihood of their recurrence precluded the possibility of a fair rerun election. In *Jamaica Towing, supra*, 632 F.2d at 212–13, we noted that, in applying *Gissel*, certain labor violations, called "hallmark" violations, have generally been considered by courts and the Board as sufficient to support issuance of bargaining orders unless mitigating factors existed. Such violations include closing of a plant or threats of closure or loss of employment, granting of benefits to employees, or reassignment, demotion or discharge of union adherents. In contrast to these violations are practices such as interrogation of employees, promises of benefits, expressions of anti-union resolve, or threats of decreased benefits, which will not support a bargaining order absent serious and long-lasting untoward effects on employees.

■■■ Having overturned the ALJ's finding of a hallmark violation—the granting of unusually large wage increases—we believe the remaining practices are insufficient to justify a bargaining order. While the re-

---

5. We note once again the continuing concern both in this Circuit, *see, e. g., Coating Products, Inc. v. NLRB*, 648 F.2d 108 (2d Cir. 1981); *NLRB v. Jamaica Towing, Inc., supra*, and elsewhere, *see, e. g., Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503 (7th Cir. 1980), over the frequency with which the Board appears to be issuing bargaining orders rather than rerun elections where employers commit unfair labor practices in the course of election campaigns. In this case, we asked counsel for the Board to inform us of the number of cases in which the Board was granting bargaining orders rather than ordering new elections. We were informed that in the past three years, in the overwhelming majority of cases in which bargaining orders were requested by the General Counsel, they were granted by the Board, and only in a small minority of those cases were elections ordered. The figures submitted, however, are not particularly informative because they exclude cases where the General Counsel has not sought a bargaining order and include cases where no election was ever held. In any event, we reiterate our concern that where the unfair labor practices are neither so pervasive as clearly to call for a bargaining order, nor so minimal as to call for a new election, the Board seems to exercise its discretion in favor of a bargaining order, despite repeated statements by this and other courts that rerun elections remain in the "preferred" or "superior" remedy under the NLRA.

maining unfair practices are numerous, they fall into the less coercive category.[6] Moreover, the unfair practices almost all consisted of implied rather than overt threats or promises, and thus were less likely to have a strong and lasting effect. Indeed, the only practice found specifically by the ALJ as certain to have lingering consequences concerned the amount of the wage increases, the practice we have found lacking support in the record. Moreover, the impressive amount of testimony by employees who did not even recall the statements which were found to constitute unfair labor practices suggests that the effects of those practices would be minimal. Finally, we note that there has been a good deal of turnover in the bargaining unit: the ALJ noted that only 21 of the original 32 employees remained at the Company at the time of the hearings, and according to the Company, only 13 of the 32 remained at the time of the Board's bargaining order. Consequently, we conclude that the record fails to show any lingering inhibitory effects or likely recurrence of the unfair labor practices. *See, e. g., Jamaica Towing, supra; Grandee Beer Distributors v. NLRB,* 630 F.2d 928 (2d Cir. 1980). We therefore deny enforcement of that part of the Board's order requiring recognition and bargaining upon request.

Enforcement of the Board's order in No. 80–4236 is granted in part and denied in part.

*No. 80–4234:*

■ In a separate matter also on appeal, No. 80–4234, the Board found that on January 19, 1980, while the earlier unfair labor practice proceeding was still before the ALJ, the Company sent a letter to all employees stating that a meeting would be held to discuss "problems" at Chester Valley, and to see if labor and management could "work together on rectifying these problems" possibly through formation of a "joint employer/employee committee." On the same day it issued its opinion approving the ALJ's resolution of the earlier unfair labor practice proceeding, the Board held that the Company's letter violated (1) sections 8(a)(5) and 8(a)(1) of the NLRA since it constituted direct dealing with employees during a time when the employer had an obligation to bargain with the Union, and (2) section 8(a)(1) of the NLRA since it constituted an unlawful solicitation of grievances. The first violation was premised upon the ALJ's holding in the earlier matter, approved by the Board, that the Company's bargaining obligation commenced on November 1, 1978, the time its unfair labor practices began. Because we have held that no bargaining obligation could be imposed by the Board, there could have been no violation of section 8(a)(5) by direct dealing.

■ The second Board holding, that of a violation of section 8(a)(1) alone, however, is affirmed, since the letter quite plainly included both a solicitation of grievances and a promise to remedy those grievances. The Company's only defense is that it has independently corrected its error by cancelling the meeting and sending letters to employees informing them of their rights under the NLRA. This is of little avail since the

---

**6.** It is arguable that Walters's statements regarding the possible conversion of the Monroe facility to self-service and the discharge of part-time employees, which statements threatened a loss or lessening of employment for some Monroe employees might constitute a "hallmark" violation sufficient to support a bargaining order. The statements would have concerned only a small number of employees in the bargaining unit and fall far short of the threats of wholesale plant closures which have been found sufficient to support bargaining orders in other cases.

We also do not believe that the fact that the employer, as found in the second Board proceeding also now before us for enforcement, again solicited grievances demonstrates a significant likelihood of recurrence of unfair labor practices. It is quite understandable that a year after the election, with the status of employee representation still in limbo, the employer would try to discuss labor problems with employees. As soon as the General Counsel intervened, the Company acted quickly to rectify its error. This is not sufficient reason to believe that the Company is likely to recommit serious unfair labor practices during a second election campaign.

Board is still entitled to enforcement of its orders despite corrective actions taken by offending parties. *See, e. g., William J. Burns Detective Agency, Inc. v. NLRB*, 441 F.2d 911, 914 (2d Cir. 1971), *aff'd on other grounds*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972).

Because of our holding as to the impermissibility of a bargaining order and the vacating of the Board's holding as to a violation of section 8(a)(5), a revised order is necessary, and we therefore deny enforcement and remand to the Board. We point out that since the Board's order in the first matter will include traditional remedies for a 8(a)(1) violation caused by improper solicitation of grievances, the remedial order in that matter might encompass all the relief needed to remedy the more recent violation of section 8(a)(1). Thus, a separate order may be unnecessary.