HERMAN SIMON AND URSULA SIMON, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Simon v. Commissioner
Docket Nos. 10911-77, 10940-77, 8908-80, 8909-80, 8910-80, 8911-80, 8912-80, 15423-80, 15627-80, 19078-80, 21030-80, 1485-81.
United States Tax Court
T.C. Memo 1986-156; 1986 Tax Ct. Memo LEXIS 445; 51 T.C.M. (CCH) 872; T.C.M. (RIA) 86156; April 21, 1986. Guy Fairstein and Burton C. Agata, for the petitioners. Theodore Kletnick,Jo-Ann Fox, and Patricia Donahue, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: In these consolidated cases, respondent determined deficiencies in petitioners' Federal income taxes and additions to the tax as follows: Taxable year
Addition to tax
Docket No.
Petitioners [2]
Ending
Deficiency
Sec. 6653(a) [3]
10911-77
H. Simon
12/31/73
[4] $4,239.81
$211.99
12/31/74
582.39
29.12
10940-77
I. Feldman
12/31/73
[5] 29,451.00
1,472.55
12/31/74
4,090.94
204.55
8908-80
N. Henin
12/31/76
304,108.00
8909-80
L. Harris
12/31/76
317,581.00
8910-80
P. Feldman
12/31/76
50,837.00
8911-80
J. Harris
12/31/76
254,017.00
8912-80
I. Feldman
12/31/76
126,154.70
15423-80
H. Simon
12/31/76
59,695.00
15627-80
Consolidated
Lumber Corp.
3/31/77
384,431.00
19078-80
National
Industries of
Lexington, Inc.
6/30/77
456,133.92
21030-80
Marilyn Togs,
Inc.
8/31/77
449,590.00
1485-81
J. Pearlstein
12/31/76
360,862.00
*447 After concessions the issue for decision [6] is the amount, if any, that petitioners as *448 partners may deduct as their distributive share of losses attributable to Tennessee Coal Associates. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners Herman Simon and Ursula Simon resided in Bergenfield, New Jersey, when they filed their petitions in this case. Petitioners Isidore Feldman and Rose Feldman resided in Kings Point, New York, when they filed their petitions in this case. Petitioners Nathan Henin and Florence Henin resided in West Lebanon, New Hampshire, when they filed their petition in this case. Petitioners Leonard Harris and Minnie Harris resided in Cedarhurst, New York, when they filed their petition in this case. Petitioners Peter Feldman and Susan Feldman resided in Kings Point, New York, when they filed their petition in this case. Petitioners *449 Jerome Harris and Anne Harris resided in Cedarhurst, New York, when they filed their petition in this case. Petitioners Peter Feldman and Susan Feldman resided in Kings Point, New York, when they filed their petition in this case. Petitioners Jerome Harris and Anne Harris resided in Cedarhurst, New York, when they filed their petition in this case. Petitioner Consolidated Lumber Corporation was a corporation with its principal place of business at Clifton, New Jersey, when its petition was filed in this case. Petitioner National Industries of Lexington, Inc., was a corporation with its principal place of business at Lexington, North Carolina, when its petition was filed in this case. Petitioner Marilyn Togs, Inc., was a corporation with its principal place of business at New York, New York, when its petition was filed in this case. Petitioners Jack Pearlstein and Thelma Pearlstein resided in Boca Raton, Florida, when they filed their petition in this case. Tennessee Coal Associates ("TCA") is a limited partnership formed by Fannie Jacobs as the general partner and her son Robert Jacobs as the limited partner. TCA was formed to "deal in and own interests in coal producing properties *450 and leases." The Certificate of Limited Partnership for TCA was dated June 29, 1976. However, the certificate stated that the partnership term commenced on January 2, 1976. TCA reported its income on the accrual basis for Federal income tax purposes. All of the individual petitioners reported their income on the cash basis. Isidore Feldman and Company also reported its income on the cash basis. The corporate petitioners reported their income on the accrual basis. In the spring of 1976 Robert Jacobs began discussing the possibility of investment in a coal venture with petitioner Peter Feldman ("Peter") and Peter's partner, petitioner Herman Simon ("Herman"). Coal prices were on an upward trend in 1976, and coal was increasingly attractive as an energy source after the 1973 oil embargo. Robert Jacobs told Peter of the favorable prospects of coal investment, and Peter subsequently discussed the investment with his father, petitioner Isidore Feldman ("Isidore"). However, the investment discussions did not proceed any further at that time. In June of 1976 Robert Jacobs again approached Peter regarding the possibility of investment in a coal venture, and Peter discussed the *451 investment with Herman and Isidore. Jacobs proposed that Peter come into TCA. Discussions regarding the investment continued through the summer, and Isidore began approaching other potential investors. Some of the potential investors whom Isidore approached and who ultimately became partners in TCA were clients of Isidore Feldman and Company, an accounting firm in which Isidore and Herman were partners. The firm prepared Federal income tax returns for these clients. Clients of Isidore Feldman and Company had invested in other projects undertaken by Peter. By letters addressed to Peter and dated September 23, 1976, and October 7, 1976, individual petitioners Nathan Henin, Leonard Harris, Jerome Harris and Jack Pearlstein each agreed to "contribute $150,000 as [his] participation in Tennessee Coal Associates." Corporate petitioners Marilyn Togs, Inc., Consolidated Lumber Corporation and National Industries of Lexington, Inc. adopted resolutions reflected in corporate minutes dated September 7, 1976, September 9, 1976, and September 28, 1976, respectively, each authorizing an investment of $250,000 in TCA or in a coal partnership in which Peter was general partner. TCA entered *452 into a coal sublease with Irving H. Kanarek and Alan S. Jacobs, a Partnership, ("K & J") by lease agreement dated October 27, 1976. [7] The agreement was signed by Fannie Jacobs as general partner of TCA and by her son Alan Jacobs for K & J. The sublease was recorded on December 29, 1976. Accompanying the sublease was a metes and bounds description of the property subject to the sublease ("Area 5"). [8] A memorandum of lease was executed on December 14, 1976, in the name of Peter as general partner of TCA by William Z. Bergenfield as his attorney-in-fact. The memorandum of lease was recorded on December 30, 1976. *453 Irving H. Kanarek was a certified public accountant who practiced in a partnership with Robert Jacobs. Their office was located at the same address as Isidore Feldman and Company. Alan Jacobs was a partner in a law firm with Herman and Eli Uncyk and had offices at the same address as Isidore Feldman and Company. Alan Jacobs and Robert Jacobs were brothers. Area 5 was approximately 900 acres of a 6,000 acre tract ("Lacy Tract").K & J executed other coal subleases relating to the Lacy Tract with at least seven other partnerships. Five of the other coal subleases were dated October 27, 1976, and signed for the lessee partnership by Fannie Jacobs as general partner. A memorandum of lease was executed for each sublease between December 14, 1976, and December 28, 1976. The memoranda of lease were recorded between December 29, 1976, and December 31, 1976. Subdivision of the Lacy Tract reduced its mining potential. The coal sublease executed by K & J and TCA provided that TCA as lessee would have the exclusive right to "mine and remove the coal on and in connection with the Premises" subject to enumerated limitations in the sublease and those in the underlying leases. The term of *454 the sublease was for ten years or the exhaustion of the merchantable and mineable coal, whichever was longer. The sublease further provided that "[a]fter the lessee has completed strip mining the surface of any tract on the Premises, the surface of such tract shall cease to be subject to this lease." Royalty payments were in the amount of a minimum annual royalty of $1,000 and a per ton royalty of $3.00 per short ton plus 25 percent of the sales price above $20.00 per short ton of steam coal or $28.00 per short ton of metallurgical coal removed, shipped or sold. In addition an advanced royalty in the amount of $6,000,000 was to be paid to K & J prior to December 31, 1976. Payment of the $6,000,000 was to be made in cash of $1,000,000 and a nonrecourse, promissory note of $5,000,000. [9] The advanced royalty was to be recouped at the rate of $2.50 per ton for each short ton of coal removed, shipped or sold. The advanced royalty was not payable until a satisfactory current title report was obtained. On forfeiture of the sublease by TCA there was no provision for abatement of any portion of the advanced royalty. *455 Prior to 1930 the Lacy Tract had been mined by the Durham Coal and Iron Company and the Fox Coal Company. At least four underground mines were opened by the two companies. No recorded mining activity occurred on the Lacy Tract between 1930 and 1970. Testing indicated that coal removed from the Lacy Tract could not be marketed other than locally. The coal would require cleaning or washing in order to be readily marketable. There was no washing facility in the immediate vicinity of the Lacy Tract although a washing facility did exist approximately 10 miles away in Dayton, Tennessee. There was transportation available to the washing facility and to potential markets for the coal. The Lacy Tract was located in Hamilton, Rhea and Bledsoe Counties in southeastern Tennessee. Area 5 was located in Hamilton and Rhea Counties and bordered Bledsoe County. This is an area of erratic coal seams. Erratic coal seams increase the cost of mining and require more extensive investigation before the decision to mine is made. The total coal production for the three counties for the 10 year period between 1967 and 1976 as shown by the Annual Production Report of Mines prepared by the Department *456 of Labor of the State of Tennessee was 997,874 tons. On October 28, 1971, Southeast Coal, Oil and Gas Co, Inc. ("Southeast") entered into a lease agreement, as lessee, with L and G Corporation, Boone Development Co., Steve Lacy, M. S. Lacy, and Wayne Graybeal, as lessors, with respect to the right to mine and remove coal on the Lacy Tract. John Wolcott signed the agreement as president of Southeast. The minimum period of the lease was 15 years. John Wolcott was a shareholder of Southeast. Under the lease Southeast was to pay a royalty of $ .25 per short ton of all coal removed, shipped or sold from underground mining and a royalty of $ .35 per short ton for all coal removed, shipped or sold from augering or stripping methods. In addition Southeast was to pay a minimum annual royalty of $60,000 in the first year and an amount not less than $60,000 in succeeding years if no mining was done on the property. The lease also gave Southeast the option to purchase the interests of the lessor in the property for a total consideration of $565,000.00. Southeast made some preparations to mine, including building a tipple. Southeast did locate a contract miner who produced approximately *457 10,000 tons through strip mining but who later abandoned mining on the property. Southeast was unable to locate another contract miner and did not do any other mining on the property. Southeast entered into a coal sublease of the Lacy Tract with K & J, as lessee, by lease agreement dated October 27, 1976. The minimum period of the sublease was 10 years. Under the sublease K & J was to pay any royalties due under the underlying lease. In addition K & J was to pay $ .10 per short ton of all coal removed, shipped or sold. K & J was also to pay an advanced royalty of $1,500,000 prior to December 31, 1976. Payment of the $1,500,000 was to be made in cash of $750,000 and a nonrecourse promissory note of $750,000. The advanced royalty was to be recouped at the rate of $ .10 per short ton of coal removed, shipped or sold. The agreement was signed by John Wolcott as president of Southeast and Alan Jacobs as a partner of K & J. The coal sublease agreement between Southeast and K & J was recorded on December 29, 1976. Peter and the limited partners who are petitioners in this action did not become formally associated with TCA until December of 1976. On December 28, 1976, and December 30, 1976, amendments *458 to the Certificate of Limited Partnership of TCA were executed, substituting Peter for Fannie Jacobs as general partner and providing for the admission of additional limited partners. Robert Jacobs, the original limited partner, continued to have an interest as a limited partner. Robert Jacob's total investment in TCA was $100 although he retained a one percent interest in TCA. In the original Federal income tax return filed by TCA, the loss attributable to this interest was $59,000. In December of 1976 an undated private placement memorandum with respect to the TCA offering was prepared but not filed with the New York State Attorney General's Office. K & J and its partners were designated as promoters. The private placement memorandum provided, in part: No agreement has been entered into with respect to mining the Partnership Coal Property. However, the General Partner has discussed such proposed agreement with the companies that furnish coal mining services. It is intended that the Partnership will enter into an Agreement * * * with such a company * * *, which may be Southeast Coal, Oil & Gas Co., Inc. * * * However, there can be no assurance that the Mining Contract will *459 be entered into on the proposed terms. Moreover, in the event the Mining Contract is entered into, there can be no assurance that the Contract Miner will be able to continue to mine the Partnership Coal Property on the basis proposed should the costs of mining increase or the price at which the Partnership coal is sold decrease. * * * Although the attractiveness of this investment is, to a considerable extent, based upon anticipated benefits currently available under the present provisions of the Internal Revenue Code of 1954, as amended, and the regulations promulgated thereunder, there is no assurance that such laws and regulations will not be changed, and there is no assurance that the anticipated tax benefits will be available to the Limited Partners. * * * * * * Recently, the Service has proposed a revision of its applicable regulation (Treasury Regulations Section 1.612-3(b)) with the effect of imposing severe restrictions on the deductibility for Federal income tax purposes of advance royalty payments similar to the Advance Royalty which the Partnership contemplates paying. Based upon the facts recited to it and the documents which it has *460 reviewed, counsel to the Partnership is of the opinion that the transaction which is the subject of this Memorandum is not affected by this proposal; however, there can be no assurance that the Service will not disagree with this conclusion or question the deductibility of the Advance Royalty on any other grounds. Each of the petitioners other than Peter signed a subscription agreement relating to the TCA offering. [10] In part, each subscriber warranted: 4. He has read and is familiar with the Private Placement Memorandum ("the Memorandum") of the Partnership * * * 5. He has consulted with his professional, tax, and legal advisors with respect to the Federal and state or local income tax consequences of his participation as a Limited Partner of the Partnership and with respect to his investment in the Units. The subscription agreements were signed between December 27, 1976, and December 31, 1976. Petitioners made payments for their limited partnership interests by checks dated between December 14, 1976, and December 31, 1976. Checks dated prior to December 29, 1976, were made payable to "Isidore *461 Feldman as Attorney." In addition Marilyn Togs, Inc. and Grady White Boats, Inc., a subsidiary of National Industries of Lexington, Inc., each delivered notes in the amount of $200,000 collateralized by an irrevocable letter of credit. On December 29, 1976, and December 31, 1976, checks in the total amount of $1,100,000 were delivered to TCA. Of this amount $912,500 was by check payable from Isidore representing amounts he had received from other investors made payable to him as attorney-in-fact. In addition the notes from Marilyn Togs, Inc. and Grady-White Boats, Inc. were delivered to TCA on December 31, 1976. TCA delivered a check to K & J in the amount of $925,000 on December 31, 1976. TCA also delivered to K & J the notes from Marilyn Togs, Inc. and Grady-White Boats, Inc. and a nonrecourse note payable by TCA in the amount of $4,675,000. The note provided for interest on the outstanding balance to commence accruing on June 1, 1977, at six percent per annum. Interest and principal were to be paid in equal monthly installments of $51,902.08 beginning on June 30, 1977. The principal amount was to be prepaid to the extent that TCA mined and sold more than 17,301 tons of *462 coal in any month. The note was secured by "a security interest in and general lien upon the Leasehold Property and the proceeds derived from the use and exploitation thereof." The above-described consideration was in lieu of the consideration described in the lease agreement between TCA and K & J dated October 27, 1976. After the payment to K & J and payments for management and legal fees, TCA retained cash in the total amount of $101,000. TCA had no other assets except a receivable in the amount of $100. As part of the coal sublease transaction between TCA and K & J, K & J entered into an agreement dated December 31, 1976, with Isidore Feldman and Company. The agreement provided that Isidore Feldman and Company would receive $300,000 and 20 percent of any amounts collected on the TCA note. These payments were to compensate Isidore Feldman and Company for its services in connection with the coal sublease between TCA and K & J. The only services Isidore Feldman and Company performed was as finder. The fact of this payment was disclosed to the limited partners of TCA. Peter did not anticipate that TCA would perform any mining activities. In fact, initial mining activities *463 were undertaken by Raybled Mining Company ("Raybled") organized by John Wolcott, Irving Kanarek and Alan Jacobs. Raybled was organized as part of the coal sublease between Southeast and K & J and was to be funded by K & J. Raybled commenced mining activities in the spring of 1977. The agreement between Raybled and TCA was never reduced to writing. Raybled subsequently contracted with Hensley & Schmidt, a local engineering company, to do on-site mining. Hensley & Schmidt had little experience in coal mining. Peter did not have any experience in developing coal or other mineral properties prior to October of 1976. Peter did not retain an independent mining consultant or financial analyst to advise him or TCA on or before October 27, 1976. Instead Peter relied on the advice of Robert Jacobs. There was information available in 1976 which indicated that there were potentially recoverable coal reserves in the vicinity of Area 5. After October 27, 1976, Peter did prepare his own projections for TCA. These projections were based on information from Robert Jacobs and from a report dated November 9, 1976, prepared by John G. Donan, Jr., of Donan Engineering, Inc. for John Wolcott *464 of Southeast ("Donan Report"). The underlying assumptions used in the Donan Report were clearly stated and included the following: 2. I assume no responsibility for matters legal in nature nor do I render any opinion as to the title or the lease which is assumed to permit the recovery of the coal. 3. It was not within the scope of this study to evaluate the mining plans to recover the coal seams and it was assumed that the coal can be mined by present mining methods and practices. * * * 4. The plats, legal descriptions, map, drill hole data, seam thickness, outcrop elevations, and other reports furnished to me were assumed to be correct. The Donan Report did not contain any estimate of costs associated with mining recoverable coal. In early 1977 Peter began looking for a mining consultant to represent him independently. The mining consultant whom he chose was Ford, Bacon & Davis, ("FBD"). FBD submitted its proposal to study Area 5 for TCA on April 22, 1977. This proposal stated in pertinent part: Scope of Work
This study will cover the following: 1. Review of existing data pertaining to the coal resources and their possibilities for commercial development *465 and exploitation. This review will reveal the data that may be lacking for planning of the mine, etc. 2. Systematic procurement of pertinent data that may be lacking. (Aerial photography of Area 5 at scale 1" = 200 feet would be in this category of data to be procured). 3. Preliminary technical and economic feasibility studies of the potential for mine development of: a. Area 5 as a segment of the overall mine development of Areas 1 through 6. b. Area 5 as an independent mine development project. 4. Study of potential markets for coal produced from Area 5. 5. Preliminary determination of the optimum rate of coal production from Area 5. 6. Preliminary development of methods of mining at select rates of coal production of Area 5 including the optimum as determined above in paragraph 4. 7. [sic] This study will include both underground and surface mining methods. 8. Preliminary determination of the capital costs of mine development, mine equipment, coal transportation equipment, and related facilities needed for developing Area 5. 9. Preliminary determination of the operating costs of mining of Area 5 at select rates of production level. 10. The preparation *466 of a preliminary cash flow statement for facilities and operations for Area 5 operated as an independent mine operation at select rates of production level. Peter and FBD agreed that the work performed by FBD would be narrower in scope than the work proposed as there was already an engineering consultant involved in the project. FBD agreed to act only as an advisor and a consultant through Myles Walsh, a mining consultant employed by FBD. TCA did not successfully develop an economically viable mining operation at Area 5. On June 27, 1977, FBD advised Peter that available information was inadequate to evaluate the feasibility of underground mining and that surface mining should be explored. Strip mining, however, was not attempted because Hiwassee Land Company, an unrelated party, owned a portion of the surface rights on Area 5. Raybled and Hensley & Schmidt continued to proceed to develop underground mining through 1977. However, after this operation resulted in a Cease Order issued by the State of Tennessee, Peter with the assistance of FBD began directing mining operations. Peter organized Deep Down Mining, Ltd., to replace Raybled as the contract miner for TCA in late *467 1977. In June of 1978 Tennessee Partners, Ltd., acquired the stock of Deep Down Mining, Ltd., and mined 10,000 tons of coal. Tennessee Partners, Ltd., made royalty payments to TCA, and TCA used the royalty amounts received to pay the interest on the nonrecourse obligation to K & J. K & J subsequently paid the amounts received from TCA to Tennessee Partners, Ltd. FBD made periodic progress reports related to the mining activities of Tennessee Partners, Ltd., which concluded that the economics of mining Area 5 were in doubt. Tennessee Partners, Ltd., subsequently ceased operations, and no further mining was attempted. OPINION Each of the petitioners in this consolidated case was a partner in TCA on December 31, 1976. [11] The issue in this case is whether petitioners may deduct their allocable share of partnership losses claimed by TCA in its taxable year ending December 31, 1976. The partnership losses are attributable to accrued expenses deducted by TCA for management fees, advanced royalties and legal fees. In his notices of deficiency, respondent disallowed the deductions attributable to TCA which were claimed by petitioners. Respondent maintains that the losses claimed *468 on petitioners' Federal income tax returns for the years at issue and the additional losses claimed by petitioners in their petitions and amended petitions are not allowable because the partnership activity was not engaged in with the objective of making a profit. In the alternative, respondent argues that the advanced royalty payment is deductible only to the extent the coal was sold, that the nonrecourse note delivered to K & J as part of the advanced royalty payment lacked economic substance, and that the amount of cash and recourse notes representing the balance of the royalty payment must be capitalized and amortized over the term of the sublease. The threshhold question is whether TCA's activities were engaged in with the objective of making a profit. Each of the expenses claimed by TCA must satisfy the requirements of section 162(a) or section 212(1) or (2). [12] In order to satisfy the requirements of these provisions the activity must be engaged in with "an actual and honest objective of making a profit." Capek v. Commissioner,86 T.C. 14, 36 (1986). A *469 reasonable expectation of profit is not required, but the taxpayer's profit objective must be bona fide. Surloff v. Commissioner,81 T.C. 210, 233 (1983); Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,Kratsa v. Commissioner,Leffel v. Commissioner,Rosenblatt v. Commissioner,Zemel v. Commissioner,734 F.2d 5-7, 9 (3d. Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984). "Profit" means economic profit without consideration of tax savings. Capek v. Commissioner,supra at 36; Surloff v. Commissioner,supra at 233. If the activity is not engaged in with the requisite objective of making a profit, the deductions are only allowable to the extent that gross income derived from the activity exceeds deductions allowable irrespective of whether the activity is engaged in for profit. Sec. 183(b)(2). *470 Where the activities are conducted by a partnership, the profit objective must be present at the partnership level. Fox v. Commissioner,supra at 1006; Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). However, since a partnership is merely a formal entity, a determination of profit objective can be made by reference to the activities of the individuals who manage the partnership. Rosenfeld v. Commissioner,82 T.C. 105, 112-113 (1984); Fox v. Commissioner,supra at 1007-1008. These individuals need not be partners. Fox v. Commissioner,supra at 1008. The issue of whether the partnership has the requisite profit objective is one of fact which is to be resolved by examination of the surrounding facts and circumstances. Capek v. Commissioner,supra at 37; Hager v. Commissioner,76 T.C. 759, 784 (1981). In making this determination, the Court will give greater weight to objective facts than mere statements of intent. Surloff v. Commissioner,supra at 233. The burden of proof *471 is on petitioners to show the existence of a profit objective. Rule 142(a). Here, during the partnership taxable year ending December 31, 1976, the record clearly indicates that none of the partners of TCA, with the exception of Robert Jacobs, took an active role in managing the partnership or developing mining operations. There is no evidence that Fannie Jacobs, the original general partner of TCA, was ever active in the management of TCA. Peter, who succeeded Fannie Jacobs and formally became the general partner of TCA on December 28, 1976, did not retain an independent mining consultant or financial analyst to advise him on or before October 27, 1976, nor does the record indicate that he retained an independent advisor at any other time prior to the date when he contacted FBD in the spring of 1977. Instead Peter acquiesced in the decisions made by Robert Jacobs and John Wolcott, Irving Kanarek and Alan Jacobs through Raybled. While Peter did prepare projections for TCA, the underlying data for these projections was supplied by Robert Jacobs and John Wolcott. As the record indicates that Robert Jacobs, John Wolcott, Alan Jacobs and Irving Kanarek actively managed TCA during *472 its taxable year ended December 31, 1976, it is their actions which are determinative of a profit objective at the partnership level. Initially, we note that all of these individuals would benefit directly or indirectly from the transactions which ultimately resulted in the sale of Area 5 to TCA irrespective of TCA's ability to profitably mine coal and pay its nonrecourse obligation to K & J. John Wolcott, a shareholder in Southeast, would be benefitted by the cash payment to Southeast by K & J for advanced royalties and payments on the underlying lease. The total cash amount paid was $750,000, presumably one-sixth or $125,000 was allocable to Area 5. Alan Jacobs and Irving Kanarek as partners in K & J received from TCA $900,000 in cash and recourse notes after the payment to Southeast attributable to Area 5 and the payment of $300,000 to Isidore Feldman and Company. The $900,000 amount would be reduced by payments in the underlying lease. The $900,000 amount would be further reduced by any amounts used to capitalize Raybled. However, there is no evidence as to what amount, if any, Raybled received from K & J. Although the record does not disclose that Robert Jacobs received *473 any cash payments either individually or through an entity in which he had an interest, it is not unlikely that he benefitted indirectly from the payments made to K & J in which his brother, Alan Jacobs, and his partner, Irving Kanarek, were partners. In addition the transactions with TCA resulted in a partnership loss of $59,000 reported on the original TCA Federal income tax return for 1976 attributable to the limited partnership interest of Robert Jacobs on an investment of $100. The actions of Robert Jacobs, John Wolcott, Alan Jacobs and, Irving Kanarek convince us that their primary objective and consequently, that of TCA for whom they were acting was to recognize the above described benefits rather than to engage in a profit making coal venture. While coal investment in general may have been attractive to investors seeking economic benefits, they marketed this venture on the basis of expected tax benefits. By utilizing an accrual basis partnership they could offer most of the investors who were cash basis taxpayers benefits which could not be recognized as individual investors. In order to find suitable investors they paid Isidore Feldman and Company a $300,000 finder's fee. *474 [13] If the expected tax benefits were recognized, Robert Jacobs, John Wolcott, Alan Jacobs and Irving Kanarek and the investors would reap substantial benefits without any activity on the part of TCA. Fortuitously, the transactions involving TCA were purportedly consummated on October 27, 1976, two days prior to the effective date of section 1.612-3(b)(3), Income Tax Regs., which would have precluded a deduction for the $6,000,000 amount characterized as an advanced royalty. [14]
Although petitioners claim that TCA did have a profit objective, this contention is not supported by the record. With the exception of John Wolcott, none of the individuals who had substantial involvement in structuring the transactions or operating TCA during 1976 testified at the trial of this case, and we may infer that their testimony would not support petitioners' claim that the coal transactions were engaged in with a profit objective. [15]Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). John Wolcott *475 did not provide any specific testimony relating to profit objective. In addition to the facts and circumstances surrounding the marketing of TCA and the failure of petitioners to adduce any testimony as to profit objective from *476 the individuals who structured and conducted the transactions, there are numerous other factors which support our conclusion that TCA did not have the requisite profit objective. First, the $6,000,000 amount characterized as an advanced royalty was grossly disproportionate to any royalties previously paid for the same property. Southeast which had acquired a coal lease on the entire Lacy Tract in 1971 was to make minimum annual royalty payments of $60,000 the first year and not less than $60,000 in succeeding years if no mining was done. The rateable share of this payment allocable to Area 5 would presumably be one-sixth or $10,000 per year. K & J, which purportedly acquired a coal sublease from Southeast for the entire Lacy Tract on the same date as it entered into the coal sublease with TCA, agreed to pay an advanced royalty of $1,500,000. The rateable share of the payment allocable to Area 5 would presumably be one-sixth or $250,000. Even assuming that the marketability of coal increased dramatically between the date of the Southeast lease and October 27, 1976, justifying an increase in the royalties paid, petitioners have offered no credible explanation as to why TCA would *477 agree on the same date of the Southeast sublease to K & J to pay an advanced royalty of 24 times the amount paid by K & J. [16]
Second, the evaluation of the mining potential of Area 5 was totally inadequate to justify a binding commitment to pay an advanced royalty in the amount of $6,000,000. It is undisputed that there were coal resources on Area 5 and that this fact was known in 1976. However, whether recovery of this coal was economically feasible was not established in 1976. Although the Donan Report which was prepared after the TCA coal sublease was purportedly executed indicated that Area 5 could be mined, it was clear on the face of this report that no reliance could be placed on the report to determine whether it was feasible to mine the coal on Area 5 as "it was assumed [for the report] that the coal can be mined by present mining methods and practices." Petitioners' own expert testified that he would have advised petitioners to enter into an option agreement on the basis of this report to permit completion of evaluation of the property. *478 In addition, although Robert Jacobs supplied information to Peter relating to profit potential, there is no evidence that Robert Jacobs' information was anything more than conjecture. Further, it is clear from the proposal submitted by FBD on April 22, 1977, that the information relating to development of mining on Area 5 was not sufficient as of that date to permit an evaluation of the economic viability of mining on Area 5. Finally, Area 5 was located in a region with errratic coal seams which would increase the cost of mining and require more extensive investigation before a decision to mine was made. The only substantial mining which had taken place on the Lacy Tract had occurred nearly 50 years prior to 1976. On the date that the coal sublease between K & J and TCA was purportedly executed, John Wolcott was aware that recent strip mining efforts had been abandoned on the Lacy Tract after a relatively insubstantial amount of coal had been mined. John Wolcott also knew that no other contract miner had been located to mine the property. Although he testified at the trial of this case, John Wolcott did not offer any explanation as to why recent mining efforts had been abandoned *479 and no other contract miners had been located to mine the property. Certainly the information known to John Wolcott did not suggest that the Lacy Tract could be successfully mined. In addition there was other information available to the parties that indicated that the coal operation contemplated on Area 5 should be carefully evaluated before any commitment was made. The Annual Production Report of Mines prepared by the Department of Labor of the State of Tennessee shows that total coal production for the years 1967 through 1976 for Bledsoe, Hamilton and Rhea Counties was 997,874 tons. The coal production required on Area 5 to recoup the $6,000,000 amount paid to K & J characterized as an advanced royalty for the ten year minimum sublease period was 2,400,000 tons of coal, almost two and one-half times the amount of production in the three counties in which Area 5 was located or adjacent to for the preceeding ten year period. The information relating to production in Bledsoe, Hamilton and Rhea Counties would be pertinent to any decision to mine Area 5. However, there is no evidence in the record that this fact was a consideration in evaluating the potential for development of *480 Area 5. Third, even had the parties actively managing TCA adequately evaluated the existence of mineable coal on Area 5, the manner in which they structured the coal sublease to TCA and conducted mining operations virtually assured failure by TCA. The Lacy Tract was divided into subdivisions rather than mined as a contiguous tract. Mining the property as separate subdivisions reduced the mining potential of the entire tract. TCA itself was not adequately capitalized to conduct underground mining operations. After the payments to K & J and payments for management and legal fees, TCA only retained $101,000 in cash for operations. Peter testified that Robert Jacobs had promised to supply $1,000,000 to a contract miner in order to mine the property. However, no binding commitment to mine the property had been executed in December of 1976 when the prospectus was prepared. Although Raybled ultimately became the contract miner for TCA, no agreement was ever executed. There is no evidence that Raybled was ever capitalized to the extent promised by Robert Jacobs or made expenditures approximating the $1,000,000 amount in relationship to the development of mining operations at Area *481 5. In fact, experts for both respondent and petitioner indicated that the contract miner did not have adequate capital to conduct mining operations contemplated at Area 5. [17]
The coal sublease executed by TCA and K & J provided that the amount characterized as advanced royalty was not payable until a satisfactory current title report was obtained. However, it is clear that such a title report was never prepared. Although the sublease provided that TCA would have strip mining rights, strip mining was precluded because the surface rights were not acquired by TCA. There is no indication that any of the parties who structured the coal sublease between K & J and TCA were aware of the ownership of the surface rights, and it is inconceivable that they could have obtained a satisfactory title report without being apprised of the ownership of the surface rights. TCA was not managed by people with coal mining experience. There is no evidence that the individuals who actively managed TCA and were to develop mining operations had any expertise in coal mining operations. *482 Although John Wolcott claimed that he was a businessman who had engaged in the coal business, the record does not indicate that he was ever actively involved in day-to-day coal operations. In fact John Wolcott was unable to provide any specific testimony relating to his coal mining experience. Despite John Wolcott's apparent lack of experience in day-to-day coal operations, he was to conduct the mining operations for TCA through Raybled. Hensley & Schmidt, the local engineering company which was selected by Raybled to do on-site mining, had little experience in coal mining. In fact, Peter endeavored to become active in the management and development of coal mining operations in the years subsequent to 1976 because mining development had not been properly conducted. [18]
*483 On the basis of this record we find that TCA's coal mining activities were not engaged in with the objective of making a profit. Instead TCA was organized and operated in 1976 in order to provide cash from the investors for John Wolcott, Irving Kanarek, Alan Jacobs and Robert Jacobs and tax benefits for the investors. Accordingly, we must deny petitioners' claimed loss deductions attributable to TCA. Having determined that TCA did not have the requisite profit objective, we decline to consider respondent's alternative arguments. To reflect the foregoing, Decision will be entered for the respondent in docket Nos. 8908-80, 8909-80, 8910-80, 8911-80, 8912-80, 15423-80, 15627-80, 19078-80, 21030-80, and 1485-81.
Decision will be entered under Rule 155 in docket Nos. 10911-77 and 10940-77.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Isidore Feldman and Rose Feldman, docket No. 10940-77; Nathan Henin and Florence Henin, docket No. 8908-80; Leonard Harris and Minnie Harris, docket No. 8909-80; Peter Feldman and Susan Feldman, docket No. 8910-80; Jerome Harris and Anne Harris, 8911-80; Isidore Feldman and Rose Feldman, docket No. 8912-80; Herman Simon and Ursula Simon, docket No. 15423-80; Consolidated Lumber Corporation, docket No. 15627-80; National Industries of Lexington, Inc., docket No. 19078-80; Marilyn Togs, Inc., docket No. 21030-80; Jack Pearlstein and Thelma Pearlstein, docket No. 1485-81.↩
2. Ursula Simon, Rose Feldman, Florence Henin, Minnie Harris, Susan Feldman, Anne Harris, and Thelma Pearlstein are parties to this action only by virtue of filing joint Federal income tax returns with their husbands. Therefore, unless otherwise specified, petitioner or petitioners shall refer to petitioner husbands only. ↩
3. Unless otherwise specified, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. ↩
4. Partnership losses in the amount of $50,298.80 from Tennessee Coal Associates, a limited partnership, were subsequently claimed by the Simons as a net operating loss carryback from 1976. The losses were attributable to the investment of Isidore Feldman and Company. ↩
5. Partnership losses in the amount of $272,052.00 from Tennessee Coal Associates, a limited partnership, were subsequently claimed by the Feldmans as a net operating loss carryback from 1976. The losses were attributable to the investment of Isidore Feldman and Company.↩
6. In the case of Herman and Ursula Simon, docket No. 15423-80, there is an additional issue relating to deductions for medical expenses under sec. 213. The amount available will be determined arithmetically based on our decision as to the deductibility of partnership losses.↩
7. As the date of execution of the agreement does not affect the conclusion we reach in these cases, we accept the date shown on the document. Nevertheless, strong proof was introduced by respondent which tends to show that there was backdating by some unknown element of the transactional parties. ↩
8. Respondent maintains that the metes and bounds description was prepared subsequent to October 27, 1976. John G. Donan, Jr., of Donan Engineering, Inc. testified that he was requested to subdivide and prepare a metes and bounds description of the 6,000 acre tract which included Area 5 on November 10, 1976. We are impelled to state, in this respect, that we found Mr. Donan to be a highly credible witness and that petitioners failed in their endeavor to impeach his testimony.↩
9. Ultimately, TCA made a cash payment of $925,000 on December 31, 1976. With the cash payment TCA delivered promissory notes of Grady-White Boats, Inc., a subsidiary of National Industries of Lexington, Inc., and Marilyn Togs, Inc. The promissory notes were in the total amount of $400,000 and were accompanied by letters of credit. In addition TCA delivered a nonrecourse note in the amount of $4,675,000.↩
10. Isidore and Herman signed as partners in Isidore Feldman and Company.↩
11. Isidore and Herman were partners in Isidore Feldman and Company which was a partner in TCA.↩
12. While the sums expended for the legal fees might have been deductible in whole or in part under sec. 212(3), petitioners presented no evidence that those expenditures were related to tax advice.↩
13. Isidore Feldman and Company invested $187,500 of this fee in TCA. ↩
14. See notes 7 and 8, supra.↩
15. Petitioners argue that such an adverse inference is not appropriate citing N.L.R.B. v. Chester Valley, Inc.,652 F.2d 263, 271 (2d Cir. 1981). However, as petitioners clearly have the burden of proof as to TCA's profit objective, their reliance on N.L.R.B. v. Chester Valley, Inc.,supra, is misplaced. Peter and Isidore who had minimal involvement in these transactions in 1976 did testify. We found Peter's testimony to be mostly self serving. His testimony is entitled to little weight in view of his pecuniary interest in the outcome of these cases, and the same is true for Isidore, Peter's father, whose firm benefitted from the transactions with the investors to the tune of $300,000 and from losses claimed as a result of its partnership interest. Peter's case is further weakened by the absence of testimony of the transactional parties such as the Jacobs who made a substantial profit from the arrangements.↩
16. In this respect it is petitioners who assert that the K & J sublease and the TCA sublease were executed on the same date.↩
17. See Surloff v. Commissioner,81 T.C. 210, 234-235↩ (1983), involving a similar situation.
18. Most of Peter's post 1976 activities seem to be hindsight to extricate himself (and his father's firm) from a disenchanting situation for the investors and to shore up the tax benefits which were claimed as a result of the transactions. Apparently, Peter was assisted in these activities by Irving Kanarek and Alan Jacobs who, through K & J, acted as a conduit to return royalty payments purportedly made by Tennessee Partners, Ltd., the contract miner engaged by Peter, to Tennessee Partners, Ltd.↩